**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | NO. 1:15-cr-00053-TWT-RGV-1 |
| | : | |
| EUGENE HARVEY | : | |

**MAGISTRATE JUDGE'S FINAL REPORT,**
**<u>RECOMMENDATION, AND ORDER</u>**

Defendant Eugene Harvey ("Harvey") is charged in a three count indictment

with conspiring with unindicted co-conspirators M.Q.H. and E.L. to carry a

concealed dangerous weapon on an aircraft, in violation of 49 U.S.C. § 46505(e) and

(c), engaging in the business of dealing in firearms without being a licensed dealer,

in violation of 18 U.S.C. §§ 922(a)(1)(A), 923(a), 924(a)(1)(D) and (2), and violating

airport security requirements, intending to commit a felony in the airport area, in

violation of 49 U.S.C. § 46314(a) and (b)(2).  [Doc. 17].[1]  Harvey has filed motions to

suppress evidence and statements, [Docs. 29 & 46], which the government opposes,

[Docs. 50, 56, 60].  An evidentiary hearing[2] on Harvey's motion to suppress his

_____

[1] The listed document and page numbers in citations to the record in this
Report, Recommendation, and Order refer to the document and page numbers
shown on the Adobe file reader linked to the Court's electronic filing database,
CM/ECF.

[2] <u>See</u> [Doc. 37] for the transcript of the evidentiary hearing.  Citations to the
evidentiary hearing transcript hereinafter will be referred to as "(Tr. at __)."  In

statements was held on May 21, 2015.  [Docs. 34 & 37].  For the reasons that follow, it is **RECOMMENDED** that Harvey's motions to suppress, [Docs. 29 & 46], be **DENIED**.

## I.  STATEMENT OF FACTS

### A.   The December 20, 2014, Arrest of Harvey

On December 19, 2014, Task Force Agent George Randell Taylor ("Agent Taylor"), who was a Senior Federal Air Marshal Assigned as a Task Force Agent with the Federal Bureau of Investigation ("FBI") Joint Terrorism Task Force, applied for and obtained an arrest warrant for Harvey.  [Doc. 1].  In the affidavit in support of the application for an arrest warrant, Agent Taylor detailed the arrest of one of Harvey's alleged co-conspirators, Mark Quentin Henry ("Henry"), on December 10, 2014, in the New York area.  [Id. at 3 ¶ 5].  Agent Taylor explained that between May 1, 2014, and December 10, 2014, Henry "obtained [] firearms from Georgia" and then "supplied 129 handguns . . ., and two 'assault rifles' . . . to a co-conspirator, who would then sell the trafficked firearms to a New York Undercover Officer." [Id. at 4 ¶ 6].  Upon Henry's arrest, Agent Taylor noted that his bag contained eighteen handguns, seven of those being loaded.  [Id. at 4 ¶ 7].  He stated that Henry had flown from Hartsfield-Jackson International Airport ("Hartsfield-Jackson") in

_____

addition, the government submitted exhibits which will be referred to as "(Gov. Ex. _)."

Atlanta to John F. Kennedy International Airport ("JFK") in New York that morning, but that prior to his flight, Henry's call records revealed that he had been in contact with a phone number registered to Harvey.[3]  [Id. at 4-5 ¶ 8].  Agent Taylor then related that Harvey was employed as a Ramp Agent/Baggage Handler by Delta and assigned to Hartsfield-Jackson.  [Id. at 5-6 ¶ 11].  After examining Harvey's access to the designated SIDA area, an area that is strictly controlled and that requires a badge with a unique access pass code to enter, "it was determined that [Harvey] entered the designated SIDA area at . . . 6:57:59 a.m. on December 10, 2014."  [Id. at 6 ¶ 12].  Agent Taylor further explained that Delta employees are not screened by the Transportation Security Administration ("TSA").  [Id. at 7 ¶ 12].

After reviewing all of the security videos available for December 10, 2014, it was determined that "Henry submitted for TSA screening at 07:27 a.m. and exited screening at 07:32 a.m." in possession of the Oakley bag he was arrested carrying. [Id. at 7 ¶ 13].  Agent Taylor averred that "[h]ad the eighteen firearms been inside the Oakley bag when Henry passed through TSA screening, the firearms would have been discovered," and he, therefore, "reasonably believe[d] the eighteen firearms bypassed security."  [Id.].  Agent Taylor recounted that call records

_____

[3] This number was also listed as the "emergency contact number and the primary contact number for [Harvey] on Delta Air Lines' ('Delta') emergency employee telephone list and [Harvey's Secure Identification Display Area ('SIDA')] security application."  [Doc. 1 at 5 ¶ 10].

revealed that Henry started texting Harvey, [id. at 7 ¶ 14], and then security footage showed Harvey[4] entering a men's restroom, immediately followed by Henry, [id. at 8 ¶ 15]. After one minute, Henry walked out of the bathroom, shortly after which Harvey followed, exiting through a door leading to the tarmac exit door.[5] [Id.]. Agent Taylor explained that Henry then boarded his flight to JFK. [Id. at 8 ¶ 16]. Based on the information presented by Agent Taylor, United States Magistrate Judge Linda T. Walker signed an arrest warrant on December 19, 2014, authorizing law enforcement agents to arrest Harvey, and the agents executed the arrest warrant on the following morning. (Tr. at 34).

At approximately 5:30 a.m. on December 20, 2014, FBI Special Agent Perry Meador ("Agent Meador"), along with "four or six" other agents, "set up surveillance in front of [Harvey's] residence" with a plan "to arrest him when he came out of his house on his way to work."[6] (Tr. at 3, 6-7, 19). When Harvey exited

---

[4] Agent Taylor explained that his "identification of [Harvey] in the video [was] based on the fact that there [was] [a] known photograph of [Harvey] exiting the tarmac door a few moments later, and he [was] wearing the same clothing." [Doc. 1 at 8 ¶ 15].

[5] Agent Taylor reported that "SIDA Access Reports establish[ed] that the SIDA badge issued to [Harvey] was used at that time to exit tarmac exit door B35." [Doc. 1 at 8 ¶ 15].

[6] Agent Taylor went to the parking area for Delta employees on Camp Creek Parkway in order to ensure that Harvey did not enter into the SIDA area at Hartsfield-Jackson. (Tr. at 35).

his house and entered his vehicle, Agent Meador "initiated [his] blue lights," "blocked his vehicle from behind," had agents come from Harvey's left and right side, and "ordered him to put [his] hands on the steering wheel." (Tr. at 7-8). After Agent Meador announced "Police, FBI," (Tr. at 7), he handcuffed Harvey and did an initial search of his person, (Tr. at 8). Agent Meador "introduced [him]self to [Harvey]," "told him that [they] had a federal arrest warrant for him for [] weapons violations," and performed a more thorough search of Harvey. (Id.). Agent Meador recovered Harvey's cell phone and his employee badge.[7] (Tr. at 9). Harvey was placed in an unmarked Fulton County police vehicle and transported to the Atlanta Police Department ("APD"). (Tr. at 11). Agent Taylor and Special Agent Mark Moore ("Agent Moore") also arrived at APD, (Tr. at 12), and in the parking lot, Agent Taylor introduced himself to Harvey, informed him that "he was being charged with conspiracy to traffic in firearms, as well as the SIDA violation," and in response to Harvey's inquiries about what was happening, Agent Taylor stated that "we need to talk and to try to work some things out here," (Tr. at 37, 52). Harvey was then taken to an interview room. (Tr. at 12, 37).

---

[7] Harvey told Agent Meador that his 11 or 12-year-old son was in the house, and arrangements were made for a female friend to come to his residence and watch his son. (Tr. at 9-10).

While Harvey was sitting in the interview room, Agent Taylor sat at a table just outside the room and completed the U.S. Marshals Service booking information form.[8]  (Tr. at 41-42).  Agent Taylor went through the entire form with Harvey, which accounted for almost thirteen minutes, without advising Harvey of his Miranda[9] rights.  (Tr. at 42, 49).  Then, Agents Taylor and Moore entered the interview room with Harvey, read him his rights,[10] obtained a waiver, and interviewed Harvey.  (Tr. at 43).  The interview continued for approximately forty-five minutes, and then Agent Taylor handed Harvey a copy of the warrant.  (Tr. at 44, 56).  After Harvey was booked, he stated that he wanted to speak with Agents Taylor and Moore again, (Tr. at 45), and he asked what the charges were,[11] and

---

[8] Agent Taylor explained that this is "a form that the U.S. Marshals requires all federal agencies, arresting agents, to fill out prior to placing an individual into custody" and "[i]t gives all biographical data, as well a medical information, telephone numbers, vehicles, just basically general emergency recall type of information and detention handling information."  (Tr. at 42).

[9] See Miranda v. Arizona, 384 U.S. 436 (1966).

[10] Harvey was advised that he had the right to remain silent, that anything he said could be used against him in court, that he had a right to speak with a lawyer and have a lawyer present during the interview, that a lawyer would be appointed for him if he could not afford one, and that he had the right to stop answering questions at any time.  (Gov. Ex. 2).

[11] When questioned by Harvey's attorney whether this was the first time he precisely told Harvey the charges, Agent Taylor stated, "That's not true," and further explained that it is "not unusual when an individual has been arrested for them to call you back, ask, you know, try asking additional questions on what's

Agent Taylor stated the charges, (Tr. at 57).  This second interview lasted only ten to fifteen minutes.  (Tr. at 46).

**B.**     **Search Warrants**

> **1.**     ***The Search of Harvey's Cell Phone Pursuant to the December 30, 2014, and February 2, 2015, Search Warrants***

On December 30, 2014, Agent Taylor applied for and obtained a search warrant for a Samsung Galaxy S 5 cell phone ("cell phone") that was recovered from Harvey's person upon his arrest on December 20, 2014.  [Doc. 60-1].  In the affidavit in support of the search warrant application, Agent Taylor related that he was investigating the activities of Harvey, who had been charged with a federal crime in a criminal complaint in the Northern District of Georgia.  [Doc. 60-1 at 2 ¶ 3].  He explained that the cell phone "was recovered from [Harvey's] person on December 20, 2014, in College Park, Georgia" and that the cell phone was currently in the FBI's possession.  [Id. at 3 ¶ 4].  Agent Taylor detailed the arrest of Henry, [id. at 4 ¶ 7], following an investigation that began May 1, 2014, [id. at 4 ¶ 8].  He indicated call records for a cell phone in Henry's possession at the time of his arrest revealed that Henry had been in contact with a telephone number later established to be Harvey's twelve times via text message before Henry's flight on December 10, 2014.  [Id. at 6 ¶ 12].  Agent Taylor stated that Harvey's SIDA Access History Report showed that

---

going on with his arrest."  (Tr. at 57-58).

Harvey "entered the designated SIDA area at the Delta Air Lines Employee Parking Lot at 6:57:59 a.m. on December 10, 2014, the same date that Henry flew with 18 firearms in his carry-on bag." [Id. at 7 ¶ 14]. Agent Taylor averred that security video footage showed that Henry exited TSA screening at 7:32 a.m., [id. at 8 ¶ 15], and call records established that shortly thereafter, Harvey and Henry began communicating through text messages, [id. at 8 ¶ 16]. Security video footage revealed that Harvey entered the restroom, located across from Gate B-26, immediately followed by Henry, and then Henry exited the restroom one minute later carrying his Oakley bag, and Harvey followed shortly thereafter. [Id. at 8-9 ¶ 17]. Henry then traveled to Concourse A, where he boarded his flight for JFK. [Id. at 9 ¶ 18]. Agent Taylor indicated that the investigation established that Harvey and Henry engaged in actions similar to their behavior on December 10, 2014, on January 31, 2014, June 6, 2014, August, 23, 2014, and November 24, 2014. [Id. at 9-11 ¶¶ 19, 21]. On August 23, 2014, Harvey and Henry exchanged ten text messages, and on November 24, 2014, "nineteen text messages were exchanged between [Harvey] and Henry . . . all prior to Henry boarding his flight." [Id.].

Agent Taylor detailed Harvey's arrest on December 20, 2014, and explained that the cell phone was recovered on Harvey's person. [Id. at 12 ¶ 23]. He then stated that during Harvey's post-arrest interview, he "admitted to using his cellular

telephone to coordinate the bag hand-off with Henry" and that he "specified that he and Henry communicated through both telephone calls and text messaging."  [Id.]. Agent Taylor averred that "there [was] probable cause to believe that evidence, fruits and instrumentalities of the above-mentioned crimes" would be found on Harvey's cell phone, [id. at 13 ¶ 24], and he therefore sought a warrant to search Harvey's cell phone as described in Attachment A[12] and to seize the records listed in Attachment B.[13]  [Id. at 13 ¶ 25].

---

[12] Attachment A identifies the item to be searched as a Samsung Galaxy S 5 Active cellular telephone that was recovered from Harvey on December 20, 2014, and currently in the FBI's possession.  [Doc. 60-1 at 23].

[13] Attachment B describes the items to be seized as "evidence of violations of Title 18, United States Code, Sections 922(a)(1)(A) and 2, and Title 49, United States Code, Section 46314," including: "1. [a]ny and all electronic notes, documents, records, or correspondence, in any format and medium (including, but not limited to, e-mail messages, text messages, chat logs and electronic messages) pertaining to the unlawful trafficking of firearms and/or unlawfully entering the airport area in violation of security requirements[;] 2. [a]ny and all electronic notes, documents, records, or correspondence, in any format or medium (including, but not limited to, e-mail messages, text messages, chat logs and electronic messages), identifying persons engaged in the trafficking of firearms and/or unlawfully entering the airport area in violation of security requirements[;] 3. [a]ny and all electronic notes, documents, records, or correspondence, in any format or medium (including, but not limited to e-mail messages, text messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about trafficking in firearms and/or unlawfully entering the airport area in violation of security requirements[;] 4. [a]ny and all film, videotapes or other photographic equipment that might be used to store or record images related to the trafficking of firearms and/or entering the airport area in violation of security requirements[;] 5. [a]ny and all address books, mailing lists, supplier lists, and any and all documents and records, in any format or medium (including, but not limited to, e-mail

United States Magistrate Judge Alan J. Baverman signed a search warrant on December 30, 2014, authorizing law enforcement agents to search Harvey's cell phone for the items described in Attachment B on or before January 13, 2015.  [Id. at 27].  On January 29, 2015, Agent Taylor signed the search warrant return and filed it with the Court, indicating that the warrant was executed on January 6, 2015.  [Id. at 28].

On February 2, 2015, Agent Taylor applied for and obtained a second search warrant for Harvey's cell phone.  [Doc. 60-2].  In the affidavit in support of this application, Agent Taylor explained that Harvey's cell phone, which was "drained of power and locked with a numerical code," was provided to the FBI, Computer

---

messages, text messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of firearms to be illegally trafficked[;] 6. [a]ny and all diaries, notebooks, notes, and any other records in any format or medium reflecting personal contact and any other activities with anyone engaged in the aiding and abetting of trafficking in firearms[;] 7. [e]vidence of user attribution showing who used or owned the Subject Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history[; and] 8. [r]ecords evidencing the use of the internet, including: a. records of Internet Protocol Addresses used; b. records of Internet activity, including firewall logs, caches, browser history and cookies, 'bookmarked' or 'favorite' web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses."  [Doc. 60-1 at 24-25 ¶¶ 1-8].  Agent Taylor explained that the terms "records" and "information" included "all of the forgoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form."  [Id. at 25-26 ¶ 8].

Analysis Response Team ("FBI-CART") for forensic analysis on January 6, 2015. [Id. at 4 ¶ 9]. He further explained that on January 6, 2015, "FBI-CART began the execution of the search warrant, to include removing and analyzing the [cell phone's] SIM Card and Micro Storage Disc," and began the "process of obtaining access to the locked [cell phone]." [Id. at 4-5 ¶ 9]. Agent Taylor related that FBI-CART continued efforts to unlock the cell phone, and FBI-CART was successful on January 23, 2015, after which a forensic image was made of the cell phone. [Id. at 5 ¶ 9]. Agent Taylor stated that he was seeking the second warrant "out of an abundance of caution" because the "process of copying data contained in the [cell phone] continued to January 23, 2015." [Id. at 5 ¶ 10].

Based on the information presented in his original and second search warrant applications, Agent Taylor averred that "evidence, fruits and instrumentalities of the above-mentioned crimes, more particularly described in Attachment B to the original application,[14] [would] be located on the data recently obtained from the [cell phone.]" [Id. at 5 ¶ 11 (footnote added)]. He therefore sought permission to "search and seize records that might be found on the [cell phone]." [Id. at 5 ¶ 12]. He explained that the records might be in the following forms: electronic storage, files, documents, and other data that is user-generated. [Id. at 5-6 ¶ 12].

---

[14] Agent Taylor attached the original application and affidavit for the December 30, 2014, search warrant. [Doc. 60-2 at 17-42].

11

Judge Baverman signed a search warrant on February 2, 2015, authorizing law enforcement agents to search Harvey's cell phone for the items described in Attachment B on or before February 16, 2015. [Id. at 43]. On February 2, 2015, Agent Taylor signed the search warrant return and filed it with the Court, indicating that the warrant was executed that same day. [Id. at 44].

**2.** *The June 4, 2015, Search of Harvey's Residence Pursuant to the May 29, 2015, Search Warrant*

On May 29, 2015, Agent Meador applied for and obtained a warrant for Harvey's residence located at 4635 Greensprings Road, College Park, Georgia 30337. [Doc. 56-1]. In an affidavit in support of the application for the search warrant, Agent Meador detailed the investigation of Harvey that began on December 10, 2014, following Henry's arrest in New York. [Id. at 5 ¶ 7]. After describing the activities of Harvey and Henry on December 10, 2014, and similar activities on January 31, 2014, June 6, 2014, August 23, 2014, and November 24, 2014, [id. at 6-10 ¶¶ 8-18], Agent Meador explained that following Harvey's arrest on December 20, 2014, and after being advised of his Miranda rights, Harvey "admitted to carrying a bag onto airport property without going through appropriate screening procedures on December 10, 2014," "me[eting] Henry in an airport restroom, where he gave the bag to Henry," and "using his cellular telephone to coordinate the bag hand-off with Henry," but he contended that "he did not know what was inside the

12

bag that he and Henry were smuggling into the passenger cabin of an airplane." [Id. at 10-11 ¶ 20].

Agent Meador averred that, based on the exchange of text messages between Harvey and Henry, he believed that Harvey's residence was used in multiple ways to further Harvey and Henry's smuggling scheme. [Id. at 12 ¶ 23]. Agent Meador detailed an instance in which Henry purchased an AK-47 from a seller, and afterwards, he contacted the seller again, asking him to send the magazine for the AK-47 to Harvey's residence. [Id. at 12 ¶ 24]. Tracking information revealed that the package with the magazine was mailed on November 17, 2014, and arrived at Harvey's residence the following day. [Id.]. Agent Meador included the following text message exchange between Harvey and Henry on November 24, 2014:

| | |
|---|---|
| Harvey: | "Ok. Let me know time I need to be at airport.  Headed out to take care of a yard" |
| Henry: | "I'm heading out there around 11.  Let say 12.  Same place?" |
| Harvey: | "Ok 12.  Let's meet closer to spine wither A or B" |
| Henry: | "Credit Union?" |
| Harvey: | "Yea that will work" |

Several hours passed and the following exchange occurred:

| | |
|---|---|
| Henry: | "I'm gonna get a burger.  Let me know when you are close by?" |
| Harvey: | "ok" |
| Harvey: | "Damn this shit is super heavy bro" |
| Henry: | "Sorry about that." |
| Henry: | "I'll be there in 5." |

| Harvey: | "Aight im waiting for bus" |
|---|---|
| Harvey: | "I'm coming up" |
| Henry: | "I drop another 100 on u in a couple of days." |
| Harvey: | "Bet. Preciate the surprise underneath." |
| Harvey: | "When u coming back?" |
| Harvey: | "I forgot other package, from mail" |
| Henry: | "Sun/Mon.  I guess I'll have to deal without it." |
| Henry: | "When u get in.  Send me a pic of what it looks like." |
| Harvey: | "Aight" |

[Id. at 13-14 ¶ 26].  Henry flew from Hartsfield-Jackson to New York on November 24, 2014.  [Id. at 14 ¶ 27].  Based on the foregoing text message exchange and Agent Meador's training, experience, and familiarization with the case, he averred that Henry and Harvey were discussing the delivery of the AK-47 magazine to Harvey's residence, and thus, Agent Meador further opined that "Henry and [Harvey] were using [] [Harvey's residence] in order to receive shipments of firearm paraphernalia in furtherance of their smuggling scheme," so Agent Meador "believe[d] that inside the [residence] exist[ed] books and records of shipment received by 'Marcus Harvy'–the fake name used by [Harvey] and Henry to receive the firearm magazine discussed above."  [Id. at 14 ¶ 28].  Agent Meador further averred that "Henry provided [Harvey] a cash payment (as described by [Harvey] as 'the surprise underneath') at the bottom of the bag with the weapons and that Henry agreed to pay [Harvey] even more money in the future."  [Id.].  Agent Meador explained that "criminals often keep ledgers, records, and other banking records to account for the

14

payments of schemes," and therefore, he believed that such evidence was located at Harvey's residence.  [Id.].

In addition, Agent Meador indicated that text messages between Henry and Harvey revealed that they used Harvey's residence to coordinate the transportation of firearms, in that Harvey would receive the firearms that would later be smuggled through Hartsfield-Jackson at his residence.[15]  [Id. at 14-15 ¶ 29].  Agent Meador also explained that the investigation had established that "The Outdoors Trader" website

---

[15] Agent Meador provided the following examples:

[O]n June 30, 2014, Henry and [Harvey] had the following text message exchange:

Henry: "I need to see u on Wed.  Leave the truc open for me on Tues."
Henry: "I'll put some cash in ur Acct this evening.["]
Harvey: "Ok[.]"

. . .[O]n July 20, 2014, the following text message exchange took place between [Harvey] and Henry:

Henry: "What's up killa?  I'm need to see u this week.  Probably tomorrow."
Harvey: "Aight, if im not home u can leave in car"
Henry: "Yep yep."

On July 21 the conversation continues:

Henry: "I dropped it off.  I'll see u tomorrow.  I'll try to make it early."
Harvey: "Ok cool[.]"

[Doc. 56-1 at 15 ¶¶ 30-31].

had been utilized by Henry to acquire at least some of the firearms.[16]  [Id. at 16 ¶ 33].

However, a review of the text messages revealed that Harvey also had an account

on this website.[17]   [Id.].  Based on the text messages, Agent Meador averred that

---

[16] Agent Meador identified "eliteteam6" as Henry's account on the website. [Doc. 56-1 at 16 ¶ 33].

[17] He provided the following text message exchange between Harvey and Henry that occurred on August 5, 2014:

> Henry: "I need ur user name and password for that site.  Outdoors trader."
> Harvey: "Ill get on in the morning and figure out the info.  Send it then"
> Henry: "K"
> Henry: "Got to the airport a little early.  I'll let u now when I'm on ur side."
> Harvey: "Ok"
> Henry: "Waling [sic] up now"
> Henry: "Do I have time to grab a burger?"
> Harvey: "Im coming up now.  D34?"
> Henry: "Inside"
> Harvey: "Walking up now"
> Henry: "Just landed.  I'll put the resy [sic] of the change in ur account this week.  Did find out the trader info?"
> Harvey: "Yo I forgot about phone, did he send it back? I don't remember login info on that website.  You can create a new one"
> Henry: "I have the phone."
> Henry: "If u can get that acct info will be helpful.  Its already established."
> Harvey: "I don't remember login name, can't you just make a new one[.]"

[Doc. 56-1 at 16-17 ¶ 34].  Agent Meador also provided additional conversations where Harvey's account on the website was discussed, including on July 18, 2014, and November 14, 2014.  [Id. at 16-17 ¶¶ 34-35 ].

Harvey and Henry were discussing an account other than "eliteteam6," that was used to acquire firearms on the website, and because Harvey did not use his cell phone to access this website, Agent Meador averred that he likely used a computer at his residence to access the other account on the website.  [Id. at 17 ¶ 36].  Agent Meador also explained that a review of data from Harvey's cell phone showed that he and Henry had used other forms of electronic communication to further their scheme.  [Id. at 18 ¶ 37].

Based on this information, Agent Meador averred that he believed at Harvey's residence "exist[ed] evidence, fruits, and instrumentalities of the scheme to traffic firearms through the restricted confines of Hartsfield-Jackson."  [Id. at 19 ¶ 39].  He therefore sought a warrant for the "seizure of electronic storage media or, potentially, the copying of electronically stored information."  [Id. at 20 ¶ 41].  United States Magistrate Judge Gerrilyn G. Brill signed a warrant on May 29, 2015, authorizing law enforcement to search the entire premises located at 4635 Greensprings Road, College Park, Georgia, Harvey's residence, as fully described

17

in Attachment A,[18] for the items described in Attachment B,[19] on or before June 12,

2015.  [Id. at 42].  The agents executed the warrant on the morning of  June 4, 2015.

See [id. at 43].

> **3.**    ***The Search of Harvey's Residence Pursuant to the June 4, 2015, Search Warrant***

During the execution of the search warrant on June 4, 2015, agents viewed a

box of ammunition in an open cardboard box in a detached storage shed in the

backyard of Harvey's residence, [id. at 37 ¶ 8], and therefore, Agent Meador sought

another search warrant to expand the scope of the search, [id. at 33, 35 ¶ 2], to seize

"[a]ny firearms, ammunition, magazines, and firearms' containers, cases or storage

devices" and "[i]nvoices, bills of sale, and documents related to the selling and

---

[18] Attachment A identified the property to be searched as "4635 Greensprings Road, College Park, GA 30337, located in the Northern District of Georgia" and described the property as a single family home with white siding and brick exterior. [Doc. 56-1 at 28].

[19] Attachment B describes the items to be seized as "[c]omputers or storage media used as a means to commit the violations described above" and evidence of who used, owned or controlled the computer at the time the things descried in the warrant were created, edited, or deleted; evidence of storage devices being attached to the computer; evidence of times the computer was used; passwords and encryption keys; records of or information about Internet Protocol addresses used by the computer and the computer's internet activity; and contextual information necessary to understand the evidence.  [Doc. 56-1 at 29-30 ¶ 1].  The agents were "authorized to search the computers, mobile phones and other devices, copy all above-described information stored on such device for examination in a controlled environment." [Id.].

buying of firearms and related equipment," [id. at 40 ¶¶ 1-2]. United States Magistrate Judge Justin S. Anand signed a warrant on June 4, 2015, authorizing law enforcement to expand the scope of the search of the premises located at Harvey's residence, as fully described in Attachment A, for the items described in Attachment B, on or before June 12, 2015. [Id. at 44]. The agents executed the warrant on June 4, 2015. See [id. at 45].

## II.  DISCUSSION

### A.    Motion to Suppress Statements Made on December 20, 2014, [Doc. 29]

Harvey moves to suppress statements he made following his arrest on December 20, 2014. See [Doc. 29]. Specifically, Harvey argues that "because [his] statements were made without the valid advice or waiver of his Miranda rights, while [he] was clearly in custody, they were illegally obtained and should be suppressed from evidence at trial." [Id. at 14]. Harvey also contends that his waiver was not "voluntarily and knowingly made." [Id. at 6-7, 14-15]. The government contends that any statements made prior to the agents advising Harvey of his rights were in response to routine booking questions, [Doc. 50 at 9], and in addition, Harvey's statements during the actual interview were made only after he knowingly and voluntarily waived his rights, [id. at 7]. The Court will address each of these arguments in turn.

### 1.    *Pre-<u>Miranda</u> Statements*

Generally, the government may not use statements obtained as a result of custodial interrogation by law enforcement officers unless the government "'demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.'" <u>United States v. Lueck</u>, 678 F.2d 895, 899 n.2 (11th Cir. 1982) (quoting <u>Miranda</u>, 384 U.S. at 444).   "An officer's obligation to administer Miranda warnings attaches . . . 'only where there has been such a restriction on a person's freedom as to render him in custody.'" <u>United States v. de los Santos</u>, No. 1:05-cv-372-WSD, 2007 WL 2331070, at *5 (N.D. Ga. Aug. 13, 2007) (citations and internal marks omitted); <u>see also</u> <u>Garcia v. Singletary</u>, 13 F.3d 1487, 1489 (11th Cir. 1994) (citing <u>Miranda</u>, 384 U.S. at 444) ("A 'custodial interrogation' occurs whenever law enforcement officers question a person after taking that person into custody or otherwise significantly deprive a person of freedom of action.").   Thus, "*Miranda* warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." <u>United States v. Adams</u>, 1 F.3d 1566, 1575 (11th Cir. 1993) (citation and internal marks omitted); <u>see also</u> <u>Miranda</u>, 384 U.S. at 444.

"Custody" for purposes of triggering <u>Miranda</u> advisements occurs when "there has been a formal arrest or restraint on freedom of movement of the degree

associated with a formal arrest." United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006) (internal marks omitted) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). This determination is made considering the totality of the circumstances, and factors relevant to this determination include but are not limited to "the location of the interview, the existence of any physical restraints such as handcuffs or drawn weapons, whether the suspect asked to leave, the officers' demeanor, the degree of pressure applied to the suspect, and whether the officers brandished weapons, touched the suspect or used language or a tone that indicate that compliance with the officers could be compelled." United States v. Martinez-Leal, Criminal Action No. 1:11-CR-19-TCB-CCH, 2011 WL 3328907, at *15 (N.D. Ga. July 6, 2011), adopted by 2011 WL 3328682, at *3 (N.D. Ga. Aug. 2, 2011) (citations and internal marks omitted). The standard is objective in that the actual subjective beliefs of the officer and defendant are irrelevant: custody exists only if a reasonable person under the same set of circumstances would feel "that his freedom of movement had been restrained to the degree associated with a formal arrest." Id.

Additionally, "[i]nterrogation . . . must reflect a measure of compulsion above and beyond that inherent in custody itself." United States v. Springfield, No. CR406-390, 2007 WL 1140912, at *3 (S.D. Ga. Apr. 13, 2007), adopted by 2007 WL 1302282, at *1 (N.D. Ga. May 1, 2007) (internal marks omitted) (quoting Rhode Island

v. Innis, 446 U.S. 291, 300-01 (1980)).  "Thus, *Miranda* was never meant to apply to all statements taken by the police after a person has been taken into custody, but only to those statements that result from 'express questioning or its functional equivalent.'" Id. (citation omitted).  Interrogation is defined as words or actions that law enforcement officers should know are "reasonably likely to elicit an incriminating response from the suspect." Innis, 446 U.S. at 300-01.  General on-the-scene questioning does not constitute interrogation for the purposes of Miranda. See Miranda, 384 U.S. at 477-78 (noting that, "[i]n such situations, the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present").  Moreover, "routine booking question[s]" are exempted from Miranda's coverage.  Pennsylvania v. Muniz, 496 U.S. 582, 601-02 (1990) (citation omitted) ("[Defendant's] answers to these first seven questions are [] admissible because the questions fall within a 'routine booking question' exception which exempts from *Miranda*'s coverage questions to secure the 'biographical data necessary to complete booking or pretrial services.'"); United States v. Doe, 661 F.3d 550, 567 (11th Cir. 2011) (quoting United States v. Sweeting, 933 F.2d 962, 965 (11th Cir. 1991)) ("'An officer's request for routine information for booking purposes is not an interrogation under *Miranda*, even though that information turns out be incriminating.'"); United States v. Walton, Criminal Action No. 1:12-CR-395-CAP, 2014 WL 3519176, at *14

22

(N.D. Ga. July 15, 2014), adopted at *1 ("[L]aw enforcement questions pursuant to routine booking procedures . . . have not been considered interrogation within the meaning of *Miranda*."). Harvey bears the burden of establishing that he was in custody and that his statements were made in response to government questioning, see United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977),[20] and the government bears the burden of proving that Harvey's statements were voluntarily given, see Colorado v. Connelly, 479 U.S. 157, 168 (1986).

Harvey contends that his statements in response to the questions contained in the U.S. Marshals Service booking information form should be suppressed because the agents failed to advise him of his Miranda rights prior to asking him these questions. [Doc. 29 at 5]; (Tr. at 41-42). Harvey asserts that he was in custody on December 20, 2014, [Doc. 29 at 12], which is undisputed, see [Doc. 50 at 7-10], and thus, the issue remaining is whether Harvey was subjected to interrogation, and therefore, entitled to be advised of his Miranda rights.

Harvey was arrested at his home on December 20, 2014, and transported to APD, where he was placed in an interview room. (Tr. at 37-38). Agent Taylor sat outside the interview room and proceeded to ask Harvey the questions contained

---

[20] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding upon panels of the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

on the U.S. Marshals Service booking form.  (Tr. at 41-42).  In fact, Agent Taylor

testified that he "went down the line list by list on the prebooking sheet of what the

booking sheet asks for."  (Tr. at 50).  Agent Taylor's interaction with Harvey was

limited to "routine booking question[s]."  Muniz, 496 U.S. at 601-02.  And, after he

completed filling out the booking information, Agents Taylor and Moore entered the

interview room with Harvey, read him the Miranda rights, and obtained a waiver

prior to conducting the interview.  (Tr. at 43).  "[T]herefore, [the routine booking]

questions asked [] [prior to the interview] fall outside the protections of *Miranda* and

[Harvey's] answers thereto need not be suppressed."[21]  Muniz, 496 U.S. at 602.

---

[21] Harvey asserts that he was in a "coercive environment" during the initial
questioning prior to being advised of his Miranda rights.  [Doc. 29 at 5].  However,
Agent Taylor testified that he was seated outside the interview room while he asked
Harvey the booking questions and filled out the form. (Tr. at 41).  In addition,
Harvey was not handcuffed, (Gov. Ex. 1), although "his leg [was] chained to the
floor," [Doc. 29 at 5].  While Agent Taylor was asking the initial booking questions,
he offered Harvey water or coffee, which Harvey accepted, and Agent Taylor asked
Harvey if he needed to use the restroom.  (Gov. Ex. 1).  Harvey alleges that he
commented on "how rough the officers were with him while making the arrest,"
[Doc. 29 at 5], but he did not complain of any injury and otherwise has failed to
provide any factual support for his contention that the circumstances of his arrest
created a coercive environment when he was subsequently questioned at APD.  As
an indicator of the "coercive environment," Harvey points to the agents' repeated
statement that it was a "federal arrest warrant."  [Id. at 5-6].  However, Harvey has
failed to point to any evidence that shows any unlawful coercion.  Indeed, there is
no evidence of physical force or threats being used against him during the interview.
See (Tr. at 3-32); see also United States v. Manson, Criminal Indictment No.
1:11–CR–13–AT–LTW–2, 2012 WL 2861595, at *2 (N.D. Ga. July 11, 2012) (footnote
and citation omitted) ("[W]hile the Defendant's interrogation while he was
handcuffed and under arrest might have carried some inherent intimidation, the

## 2.     *Post-Miranda Statements*

After completing the booking form, Agent Taylor interviewed Harvey. Agent Taylor testified that Harvey was advised of his Miranda rights at the beginning of the interview, and Harvey signed the advice of rights form and consented to be interviewed by Agents Taylor and Moore. (Tr. at 43). Harvey argues that his waiver was not "voluntarily and knowingly made." [Doc. 29 at 6-7, 14-15].

Statements made in response to custodial interrogation are admissible only if the defendant was informed of his Miranda rights and waived them. The government bears the burden of proving by a preponderance of evidence that Harvey validly waived his Miranda rights.[22]   United States v. Chirinos, 112 F.3d

---

overall circumstances of the interrogation were not sufficiently coercive as to vitiate the voluntariness of Defendant's statements."). Thus, Harvey's argument is without merit. Harvey also argues that certain interrogation techniques are "off the table to law enforcement" prior to advising a defendant of his Miranda rights, and he cites Missouri v. Seibert, 542 U.S. 600 (2004), where the court found Miranda warnings inserted in between a "coordinated and continuing interrogation" would likely mislead the defendant. [Doc. 29 at 13]. However, Harvey's reliance on Seibert is misplaced because, for the reasons already discussed, the routine booking questions asked by Agent Taylor did not constitute interrogation for the purposes of Miranda. Muniz, 496 U.S. at 601-02; Doe, 661 F.2d at 567; Walton, 2014 WL 3519176, at *14.

[22] In Miranda, the Supreme Court acknowledged that custodial interrogations, by their very nature, create "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467. Therefore, to address this inherent compulsion and protect a suspect's Fifth Amendment privilege against self-incrimination, Miranda established certain procedures officers must follow. Specifically, prior to the initiation of questioning, officers must fully advise the suspect of the government's

1089, 1102 (11th Cir. 1997); see also Connelly, 479 U.S. at 168-69.  A defendant may

waive his rights under Miranda if the waiver is made knowingly, intelligently, and

voluntarily.  Miranda, 384 U.S. at 444.  This inquiry has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the
> sense that it was the product of a free and deliberate choice rather than
> intimidation, coercion, or deception.  Second, the waiver must have
> been made with a full awareness of both the nature of the right being
> abandoned and the consequences of the decision to abandon it.  Only if
> the 'totality of the circumstances surrounding the interrogation' reveal
> both an uncoerced choice and the requisite level of comprehension may
> a court properly conclude that the *Miranda* rights have been waived.

United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, *3

(N.D. Ga. Aug. 10, 2007), adopted at *1 (quoting United States v. Barbour, 70 F.3d

580, 585 (11th Cir. 1995)); see also Moran v. Burbine, 475 U.S. 412, 421 (1986);

Edwards v. Arizona, 451 U.S. 477, 482 (1981); Fare v. Michael C., 442 U.S. 707, 725

(1979); Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).  The voluntariness

analysis depends on whether "the defendant's will was overborne."  Lynumn v.

Illinois, 372 U.S. 528, 534 (1963).  Thus, to find that a waiver was involuntary,

"coercive police activity is a necessary predicate."  Connelly, 479 U.S. at 167; see

---

intention to use his statements to secure a conviction, and must inform him of his
rights to remain silent and to "have counsel present . . . if [he] so desires."  Id. at 468-
70.  Miranda further requires that law enforcement respect the suspect's decision to
exercise his rights as outlined in the warnings.  "If the individual indicates in any
manner, at any time prior to or during questioning, that he wishes to remain silent,
the interrogation must cease."  Id. at 473-74.  "If the individual states that he wants
an attorney, the interrogation must cease until an attorney is present."  Id. at 474.

also Moran, 475 U.S. at 421 (noting the relinquishment of a Miranda right must be the product of free and deliberate choice rather than intimidation, coercion, or deception). Therefore, "in the absence of police coercion, a court cannot conclude a defendant's waiver or inculpatory statements are involuntary." United States v. Minard, 208 F. App'x 657, 660 (10th Cir. 2006) (unpublished).

"A valid waiver, however, requires more than just a finding of voluntariness. In addition to being voluntary, a waiver of *Miranda* rights must also be knowing and intelligent." Id. (citation omitted). In contrast to a finding of voluntariness, "a court need not find coercion in order to find a defendant's waiver unknowing or unintelligent." Id. (citation omitted). No single factor is determinative of the issue of whether a defendant knowingly and intelligently waived his Miranda rights, "but the court must engage in a fact-specific inquiry based on all of the circumstances." Patterson, 2007 WL 2331080, at *3. "However, an express oral or written waiver of *Miranda* is strong proof of the validity of the waiver." United States v. Degaule, 797 F. Supp. 2d 1332, 1378 (N.D. Ga. 2011) (citation omitted). "[T]he totality of the circumstances must demonstrate a defendant waived his rights with a 'requisite level of comprehension.'" Minard, 208 F. App'x at 660 (quoting Moran, 475 U.S. at 421).

The uncontested testimony of Agent Taylor at the evidentiary hearing satisfies the government's burden of establishing that Harvey knowingly, voluntarily, and intelligently waived his rights and agreed to speak with the agents during the interview.  Agent Taylor testified that Agent Moore read Harvey his <u>Miranda</u> warnings from an FBI Advice of Rights Form, FD-395.[23]  (Tr. at 43, 52).  Harvey signed the form, and Agents Taylor and Moore witnessed his signature at 7:50 a.m. (Tr. at 43; Gov. Ex. 2).

To find a waiver involuntary, "coercive police activity is a necessary predicate."  <u>Connelly</u>, 479 U.S. at 167.  However, there is no evidence in the record of any unlawful coercion of Harvey prior to his waiver or during the interview on

_____

[23] The Advice of Rights form states:

Before we ask you any questions, you must understand your rights.
You have the right to remain silent.
Anything you say can be used against you in court.
You have the right to talk to a lawyer for advice before we ask you any questions.
You have the right to have a lawyer with you during questioning.
If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

(Gov. Ex. 2).  The form additionally provides a line for the defendant to sign under the following statement: "I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present."  (<u>Id.</u>).

28

December 20, 2014.  The interview was conducted in a room at APD where he was seated with two law enforcement agents.  (Gov. Ex. 1).  The agents conducted the entire interview in a conversational tone and did not raise their voices or yell at Harvey.  (Id.).  Harvey's leg remained shackled during the interview, though his handcuffs were removed, but there is no evidence of any physical force or threats being employed against him.  (Id.).  Although Agents Taylor and Moore each had a firearm, their firearms remained holstered throughout the interview.  (Id.).  Nor did the agents make any promises to Harvey to induce him to speak against his will. (Id.).  Accordingly, the totality of the circumstances demonstrate that Harvey voluntarily waived his rights.  See United States v. Telcy, 362 F. App'x 83, 86–87 (11th Cir. 2010) (per curiam) (unpublished) (finding voluntary consent where defendant was in handcuffs and in custody because officers did not employ any coercive tactics, brandish their weapons, or threaten, lie, or otherwise pressure defendant to consent to search); United States v. Burston, Criminal Action No. 1:12-CR-180-01-JOF/AJB, 2013 WL 787909, at *11 (N.D. Ga. Jan. 4, 2013), adopted by 2013 WL 787911, at *1 (N.D. Ga. Mar. 1, 2013) (finding the defendant's waiver voluntary where there was no evidence "of any coercion, deception, or intimidation," "weapons were not displayed," and "there was no evidence of any threats or promises"); Manson, 2012 WL 2861595, at *2 (footnote and citation omitted)

("[W]hile the Defendant's interrogation while he was handcuffed and under arrest might have carried some inherent intimidation, the overall circumstances of the interrogation were not sufficiently coercive as to vitiate the voluntariness of Defendant's statements.").

Harvey argues that his waiver was not knowingly and voluntarily made because he was not advised of the charges prior to waiving his rights. [Doc. 29 at 7-8, 14-15]. In particular, Harvey contends that "he was offered the 'hope of benefit' that the agents would tell him 'the reason why he was [t]here,' i.e., what he was charged with, if he waived his <u>Miranda</u> rights" and that his waiver was not knowing and voluntary because the "agents did not tell him the nature of the offense with which he was charged prior to (or even during) the interview." [Doc. 29 at 15 (alteration in original)]. In support of his argument, Harvey cites 18 U.S.C. § 3501(b), which states that "[t]he trial judge in determining the issue of voluntariness shall take into consideration all of the circumstances surrounding the confession, including . . . whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession[.]" 18 U.S.C. § 3501(b). However, <u>Miranda</u> "govern[s] the admissibility of statements made during custodial interrogation" in federal court, <u>United States v. Beavers</u>, Criminal Action File No. 4:12-CR-00009-RLVWEJ-7, 2012 WL 4866491, at *3 (N.D.

Ga. Aug. 8, 2012), adopted by 2012 WL 4864990, at *1 (N.D. Ga. Oct. 11, 2012), and

the Supreme Court declared § 3501 unconstitutional, <u>Dickerson v. United States</u>, 530

U.S. 428, 444 (2000).  "Accordingly, [Harvey] has no basis to rely on § 3501."

<u>Beavers</u>, 2012 WL 4866491, at *3.[24]

The record demonstrates that Harvey knowingly and intelligently waived his

rights after they were read to him by Agent Moore.  (Gov. Ex. 1).  Harvey is an adult

who appeared to understand what the agents discussed with him based on his

responses to their questions during the booking process and throughout the

interview.  (<u>Id.</u>).  There is no evidence that his mental and physical status at the time

of the interview resulted in any misunderstanding of his rights.  (<u>Id.</u>).  Indeed, he

did not ask any questions or otherwise indicate that he did not understand his

rights, (<u>id.</u>), and he initialed and signed the waiver, (Gov. Ex. 2).  Harvey did not

appear to be under the influence of drugs or alcohol at any time during his

interactions with the agents.  (Gov. Ex. 1).  The signed waiver and video recording

of his interview support finding that he knowingly and intelligently waived his

---

[24]  Moreover, "a valid waiver does not require that an individual be informed
of all information 'useful' in making his decision or all information that 'might . . .
affec[t] his decision to confess.'"  <u>Colorado v. Spring</u>, 479 U.S. 564, 576 (1987)
(alternations in original).  It is "clear that agents do not have to tell a defendant the
reason why they want to question him," and in fact, "they may even mislead him
about the reason for their questioning, as long as he understands the nature of his
rights and the legal consequences of waiving them."  <u>Beavers</u>, 2012 WL 4866491, at
*5 (citations omitted).

Miranda rights, Degaule, 797 F. Supp. 2d at 1378; (Gov. Exs. 1-2), and it is therefore

**RECOMMENDED** that Harvey's motion to suppress his statements, [Doc. 29 at 4-8,

12-15], be **DENIED**.

B.     **Motion to Suppress Evidence Obtained from the Search of Harvey's Cell**
       **Phone, [Doc. 29]**

Harvey argues that the search warrants for his cell phone were illegal, overly

broad, and non-particularized.  [Doc. 29 at 15].  Specifically, Harvey contends that

the warrants "failed to provide any nexus between the items sought, the places

searched, and the alleged charges."  [Id.]; see also [Doc. 63 at 6].  Harvey also asserts

that the search warrants "authorized a search and seizure of every possible and

conceivable piece of data on the phone and any files or data contained in any email

accounts related to the phone or related applications for third-party websites, such

as Facebook" and "failed to provide any time period for which items would be

searched," [Doc. 29 at 15], and that law enforcement continued to search Harvey's

phone, even after the warrant had expired, [id. at 19.  Lastly, Harvey alleges that the

good faith exception does not apply here.  [Doc. 63 at 7].[25]

---

[25] In his first particularized motion to suppress evidence, [Doc. 29], Harvey
noted that cell site location information was included in the discovery, and he
reserved the right to amend his motion to challenge this evidence, [id. at 20-22], but
he has not done so, and any Fourth Amendment challenge to such data obtained
from a third party provider is foreclosed in the Eleventh Circuit by United States v.
Davis, 785 F.3d 498, 513-18 (11th Cir. 2015).

1.    *Probable Cause*

Harvey contends in a single sentence that the affidavit "failed to provide any nexus linking the use of computer applications, e-mails, texts, or any other place or file sought to be searched to the alleged crimes."  [Doc. 29 at 15].  The Eleventh Circuit has explained the Court's review of the sufficiency of a search warrant as follows:

> When called upon by law enforcement officials to determine the legitimacy of search warrants and their supporting affidavits, issuing magistrates and reviewing courts alike must strike a delicate balance between constitutional guarantees against excessive intrusions into areas of individual freedom and the Government's need to access and to secure relevant evidence in criminal prosecutions.  In particular, issuing magistrates are given the unenviable task of making "firing line" decisions that attempt to encourage availment of the warrant process while simultaneously striving to protect citizens from unwarranted governmental interference.   In recognition of the difficulty inherent in discharging this responsibility, reviewing courts lend substantial deference to an issuing magistrate's probable cause determinations.

United States v. Miller, 24 F.3d 1357, 1363 (11th Cir. 1994).  "The Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that an offense has been committed and that evidence exists at the place for which the warrant is requested."  United States v. Betancourt, 734 F.2d 750, 754 (11th Cir. 1984) (citing Zurcher v. The Stanford Daily, 436 U.S. 547, 558 (1978)); see also United States v. Cadet, Criminal Action Nos. 1:11-CR-00522-WBH-LTW, 1:11-CR-00113-

33

WBH-LTW, 2013 WL 504892, at *4 (N.D. Ga. Jan. 16, 2013), adopted by 2013 WL 504815, at *1 (N.D. Ga. Feb. 8, 2013). That is, "[p]robable cause to search a residence requires some nexus between the premises and the alleged crime." United States v. Joseph, 709 F.3d 1082, 1100 (11th Cir. 2013) (citation and internal marks omitted). "Probable cause deals 'with probabilities [which are] . . . the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Illinois v. Gates, 462 U.S. 213, 241 (1983) (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)); see also United States v. Spann, No. 15–20070, 2015 WL 1969111, at *3 (S.D. Fla. May 1, 2015).

"Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner." Miller, 24 F.3d at 1361 (citation omitted). Instead, "a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." Id. (citations omitted); see also United States v. McCullough, Criminal Indictment No. 1:11–CR–136–JEC/AJB–01, 2012 WL 11799871, at *13 (N.D. Ga. Oct. 9, 2012), adopted by 2014 WL 3955556, at *2 (N.D. Ga. Aug. 13, 2014). Furthermore, "[t]he fact than an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause." United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985)

(citations omitted); see also Adams v. Williams, 407 U.S. 143, 149 (1972) (citation omitted).

Contrary to Harvey's assertion, Agent Taylor's affidavit alleged ample facts to establish probable cause to believe that evidence of a crime would be found in Harvey's cell phone. Agent Taylor recounted the details of the arrest of Henry, Harvey's alleged co-conspirator. [Doc. 60-1 at 4 ¶ 7]. He relayed that Henry's call records revealed that he had been in contact with a telephone number registered to Harvey twelve times via text message before his flight on December 10, 2014, [id. at 6 ¶ 12], nineteen times via text messages on November 24, 2014, before his flight, [id. at 11 ¶ 21], and ten times via text messages on August 23, 2014, before his flight, [id. at 10-11 ¶ 19]. In addition, Agent Taylor stated that during Harvey's interview following his arrest, he "admitted to using his cellular telephone to coordinate the bag hand-off with Henry" and that "he and Henry communicated through both telephone calls and text messaging." [Id. at 12 ¶ 23]. These facts provided probable cause to believe that evidence of the alleged crimes would be located in Harvey's cell phone. United States v. Mathis, 767 F.3d 1264, 1276 (11th Cir. 2014) (per curiam) (finding the affidavit established probable cause because it explained that the defendant used his phone to communicate with the victim). Therefore, Harvey's

conclusory contention that the affidavit did not establish probable cause is without merit.

**2.      *Particularity of the Items to be Seized***

"The Fourth Amendment requires that a warrant particularly describ[e] the place to be searched, and the persons or things to be seized." United States v. Bemka Corp., 368 F. App'x 941, 943 (11th Cir. 2010) (per curiam) (unpublished) (alteration in original) (citation and internal marks omitted). "A warrant is sufficient where it describes 'the place to be searched with sufficient particularity to direct the searcher, to confine his examination to the place described, and to advise those being searched of his authority.'" United States v. Aguirre, 368 F. App'x 979, 987 (11th Cir. 2010) (per curiam) (unpublished) (quoting United States v. Burke, 784 F.2d 1090, 1092 (11th Cir. 1986)). "The particularity requirement allows a practical margin of flexibility, depending on the type of property to be seized, and 'a description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit.'" Id. at 987-88 (quoting United States v. Wuagneux, 683 F.2d 1343, 1349 (11th Cir. 1982)).

Attachment B to the search warrants at issue described in detail the types of items to be seized.[26]  [Doc. 60-1 at 24-26]; see also [Doc. 60-2 at 40-42].  Contrary to

_____

[26] A detailed description of the property to be searched was attached to the warrant and it specifically identified the property as "a Samsung Galaxy S 5 Active

Harvey's contention that the warrant "would allow a search of all files and all emails within the cell phone with no probable cause limitation on which files could be seized," [Doc. 29 at 15], the description in Attachment B is not overly broad or vague and it restricts the scope of what may be searched and seized with sufficient particularity to enable the "searcher to reasonably ascertain and identify the things authorized to be seized," United States v. Ortiz-Aleman, Criminal Case No. 1:11–CR–0020–ODE–JFK, 2011 WL 3739528, at *4 (N.D. Ga. July 21, 2011), adopted by 2011 WL 3739425, at *1 (N.D. Ga. Aug. 24, 2011) (citation and internal marks omitted); see also United States v. Zellner, Criminal Indictment No. 1:09-CR-320-TCB-GGB, 2011 WL 530718, at *10 (N.D. Ga. Jan. 14, 2011), adopted by 2011 WL 529952 (N.D. Ga. Feb. 4, 2011) (citation omitted) (finding "'language [] directed to materials having a nexus to [the crime being investigated] . . . . meets the standards of practical accuracy that enable the searcher to ascertain and identify things authorized to be seized.'").   The warrants were limited to evidence of unlawful trafficking in firearms and unlawful entry of an airport in violation of security requirements and therefore "did not permit a free-ranging search." United

_____

cellular telephone recovered from the person of [] Harvey on December 20, 2014 in College Park, Georgia" that was "currently located at the [FBI] in Atlanta, Georgia." [Doc. 60-1 at 23]; see also [Doc. 60-2 at 39].  Harvey does not contend that the warrants did not particularly describe the property to be searched.  See [Doc. 29 at 15-16].

States v. Brooks, No. 3:13-cr-58-J-34JRK, 2014 WL 292194, at *11 (M.D. Fla. Jan. 27,

2014), adopted at *2 (citations omitted); see also Signature Pharmacy, Inc. v. Wright,

438 F. App'x 741, 745-46 (11th Cir. 2011) (per curiam) (unpublished) (citations

omitted) (finding the items to be seized were described with particularity where the

items were limited by the specific crimes charged"). "[T]he [C]ourt simply does not

understand how these warrants fail[s] to adequately particularize the items to be

seized," Ortiz-Aleman, 2011 WL 3739528, at *4, and the Court concludes that the

search warrants for Harvey's cell phone sufficiently particularized the things to be

seized "because the warrant[s] identified the types of property authorized to be

seized and indicated the crimes involved for which evidence was sought," United

States v. Conrad, No. 3:12-cr-134-J-34TEM, 2013 WL 4028273, at *8 (M.D. Fla. Aug.

7, 2013), adopted at *1 (citation omitted).

Harvey argues the warrants were not particularized because they "failed to

provide any time period for which items would be searched."  [Doc. 29 at 15].

"[T]he Court finds that the warrants were already adequately particularized based

on the subject matter limitation to evidence relating to [unlawful trafficking in

firearms and unlawful entry of an airport in violation of security requirements], and

therefore an additional temporal limitation was not required." United States v. Lee,

Criminal Action File No. 1:14-cr-227-TCB-2, 2015 WL 5667102, at *10 (N.D. Ga. Sept. 25, 2015), adopted at *4. Thus, this argument is without merit.

Harvey also argues that the affidavit "failed to provide sufficiently specific guidelines for identifying and separating documents sought in the warrant from those outside the scope of the warrant." [Doc. 29 at 16]. However, the warrants specifically provided that evidence pertaining to unlawful trafficking in firearms and unlawful entry of an airport in violation of security requirements could be seized, and thus, "by the plain terms of the warrant[s], the officers were only to seize records reasonably connected to illegal [trafficking in firearms and unlawful entry of an airport in violation of security requirements] based upon the indicia of probable cause in the affidavit." United States v. Jackson, No. 3:14-CR-1 (CAR), 2015 WL 2236400, at *14 (M.D. Ga. May 12, 2015). In addition, Harvey contends that there was no search procedure or guidelines. [Doc. 29 at 16-17]. In support of his argument, Harvey relies on cases outside the Eleventh Circuit, yet "[i]t is well-established in the Eleventh Circuit that warrants of this nature need not specify search protocols or methodologies in order to pass constitutional muster." United States v. Intakanok, No. CR 114–060, 2014 WL 4825368, at *8 (S.D. Ga. Sept. 25, 2014), adopted at *1 (citation omitted) (citing United States v. Bradley, 644 F.3d 1213, 1258 (11th Cir. 2011); United States v. Khanani, 502 F.3d 1281, 1290 (11th Cir. 2007));

39

Brooks, 2014 WL 292194, at *12 (citations omitted); Conrad, 2013 WL 4028273, at *8 (citations omitted).  In this case,  "having established a nexus between the crime alleged and the . . . []phone . . ., a thorough search of [the phone] was the only practical way to determine whether [it] contained evidence of the crime alleged or any other information responsive to the specific categories of information set forth in the warrants."  Intakanok, 2014 WL 4825368, at *8.  Thus, Harvey's arguments in this respect likewise fail.

### 3.   *Expiration of the December 30, 2014, Search Warrant*

"The Fourth Amendment does not specify that search warrants contain expiration dates."  United States v. Gerber, 994 F.2d 1556, 1559 (11th Cir. 1993); United States v. Hodges, Criminal Case No. 1:09-CR-562-CAP-LTW, 2010 WL 4639238, at *3 (N.D. Ga. Sept. 15, 2010) (citations omitted).  Indeed, the Fourth Amendment "contains no requirements about when the search or seizure is to occur or the duration."  Hodges, 2010 WL 4639238, at *3 (citation and internal marks omitted).  However, "Rule 41(e)(2)(A)(i) [of the Federal Rules of Criminal Procedure] provides that warrants must command officers to execute the warrant within a specified time no longer than 14 days."  United States v. Ilonzo, Criminal File No. 1:12-CR-276-SCJ-GGB, 2015 WL 5827598, at *22 (N.D. Ga. Oct. 6, 2015), adopted at *6.  "Violations of Rule 41 do not necessarily rise to the level of constitutional

violations, however." United States v. Ahmad, No. 11-CR-6130L, 2012 WL 1944615, at *8 (W.D.N.Y. May 29, 2012), adopted by 2012 WL 3028302, at *3 (W.D.N.Y. July 24, 2012) (citation omitted).  When analyzing Rule 41 violations pertaining to search warrants, the Eleventh Circuit has stated:

> Unless a clear constitutional violation occurs, noncompliance with Rule 41 requires suppression of evidence only where (1) there was prejudice in the sense that the search might not have occurred or would not have been so abrasive if the rule had been followed, or (2) there is evidence of an intentional and deliberate disregard of a provision in the Rule.

United States v. Brown, 569 F. App'x 759, 762 (11th Cir. 2014) (per curiam) (unpublished) (emphasis, citation, and internal marks omitted); Gerber, 994 F.2d at 1560 (citations omitted) ("Federal courts that have addressed the precise issue presented in this case have concluded that completing a search shortly after the expiration of a search warrant does not rise to the level of a constitutional violation and cannot be the basis for suppressing evidence seized so long as probable cause continues to exist, and the government does not act in bad faith."); United States v. Ellis, Criminal Case No. 1:10-CR-00189-TWT-LTW, 2011 WL 1375583, at *4 (N.D. Ga. Mar. 4, 2011), adopted by 2011 WL 1375574, at *1 (N.D. Ga. Apr. 11, 2011) (finding analysis for Rule 41 violations adopted by the Eleventh Circuit should also apply to "technical violations of the warrant itself"); see also Ahmad, 2012 WL 1944615, at *8 (citations omitted).

Although the original December 30, 2014, search warrant expired on January 13, 2015, [Doc. 60-1 at 27], the cell phone was not unlocked and imaged until January 23, 2015, [Doc. 60-2 at 5 ¶ 9]. In this case, there has not been a clear constitutional violation, see United States v. Stanton, No. 2:09-cr-175-MEF, 2010 WL 2179892, at *9 (M.D. Ala. Apr. 30, 2010), adopted by 2010 WL 2179890, at *1 (M.D. Ala. May 27, 2010), and thus, whether suppression of the evidence is warranted depends on whether there was prejudice or whether the agents deliberately and intentionally disregarded Rule 41 and the expiration date in the warrant, Brown, 569 F. App'x at 762. Harvey has not shown that he was prejudiced "in the sense that the search might not have occurred or would not have been so abrasive" if the search warrant had been executed by January 13, 2015. Gerber, 994 F.2d at 1560 (emphasis and citation omitted).

In addition, there is no evidence that the government intentionally and deliberately disregarded the search warrant's date of expiration. Instead, the government asserts that Harvey's phone, "which was drained of power and locked with a numerical code," was given to FBI-CART on January 6, 2015. [Doc. 60 at 4]. Despite diligent efforts to gain access to Harvey's phone, FBI-CART was unable to unlock the phone until January 23, 2015, at which time a forensic image was made. [Id.]. Agent Taylor then sought a second warrant on February 2, 2015. [Doc. 60-2

at 1, 43].  Indeed, the  government argues that "[n]o examination of the copied data
was begun until after the second search warrant was obtained."   [Doc. 60 at 4].
Moreover, probable cause continued to exist on January 23, 2015.   Because Harvey
has not alleged any prejudice, there is no evidence that the government acted in bad
faith, and the delay did not diminish probable cause, Harvey's argument for
suppression is without merit, and therefore, the imaging of Harvey's cell phone on
January 23, 2015, after the expiration of the December 30, 2014, search warrant does
not warrant suppression of the evidence obtained from his cell phone.  See United
States v. Filippi, No. 5:15-CR-133 (BKS), 2015 WL 5789846, at *7 (N.D.N.Y. Sept. 9,
2015) (holding government's one-month delay in searching the phone after
expiration of the warrant did not warrant suppression of the evidence because
"there [was] no evidence that the government acting in bad faith or with deliberate
disregard of the search warrant deadline," the defendant did "not allege any
prejudice," and the delay "did not diminish probable cause for the search of
defendant's phone"); Ahmad, 2012 WL 1944615, at *8 (denying defendant's motion
to suppress because even though the agent did not execute the warrant until four
days after its expiration, "probable cause to seize the items had not lapsed," the
defendant "made no showing or even suggestion of prejudice resulting from the

belated execution[,] and no evidence exists that [the agent] intentionally disregarded the terms of the warrant").

**4.**   *Good Faith Exception*

Even if the search warrants at issue were found to be invalid, suppression of the evidence seized from the cell phone would not be warranted because the officers executing the warrants reasonably relied in good faith on the validity of the warrants. See United States v. Leon, 468 U.S. 897, 919-21 (1984). Under Leon, "the exclusionary rule should not be applied to exclude evidence seized pursuant to a defective search warrant if the officers conducting the search acted in 'objectively reasonable reliance' on the warrant and the warrant was issued by a detached and neutral magistrate." United States v. Sharp, Civil Action File No. 1:14–cr–229–TCB, 2015 WL 4641537, at *14 n.18 (N.D. Ga. Aug. 4, 2015), adopted at *5 (citations and internal marks omitted); see also United States v. Robinson, 336 F.3d 1293, 1295-96 (11th Cir. 2003).

There are four exceptions to the Leon good-faith exception doctrine:

(1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role in the manner condemned in Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of

the particular case, a warrant is so facially deficient-i.e., in failing to particularize the place to be searched or the things to be seized-that the executing officers cannot reasonably presume it to be valid.

United States v. Martin, 297 F.3d 1308, 1313 (11th Cir. 2002) (citation and internal marks omitted). Harvey argues that an exception to the good faith doctrine applies in this case. Specifically, he claims that the "warrant's description of items to be seized . . . was so patently overbroad as to fail, on its face, to particularize the items to be seized," and therefore, he contends that the agents' "reliance on that warrant was objectively unreasonable[.]" [Doc. 63 at 7]. However, as discussed *supra*, this argument is without merit. In addition, there is nothing in the record that even hints that the judge who reviewed the affidavits and signed the search warrants engaged in any misconduct or abrogation of judicial responsibility. As stated earlier, the affidavit set forth sufficient probable cause, and in any case is not "so lacking . . . as to render official belief in its existence entirely unreasonable." Martin, 297 F.3d at 1313 (citation omitted).

Finally, the warrants are facially valid in that they describe in sufficient detail the things to be seized, the location for the search, and it is signed by a judge. Officers executing the warrants would therefore have been justified in believing in their validity, and evidence seized during the execution would not be subject to suppression. Massachusetts v. Sheppard, 468 U.S. 981, 981-82 (1984). Accordingly,

45

it is **RECOMMENDED** that Harvey's motion to suppress evidence arising from the search of his cell phone, [Doc. 29 at 8-11, 15-20], be **DENIED**.

## C.   Motion to Suppress Evidence Obtained from the Search of Harvey's Residence, [Doc. 46]

### 1.   *May 29, 2015, Search Warrant*

Harvey argues that the May 29, 2015, search warrant for his residence was invalid because the affidavit upon which it was obtained was not supported by probable cause and the information contained in the affidavit was stale, [Doc. 46 at 11-13]. Harvey also asserts that the warrant was overly broad and did not describe the items to be seized with sufficient particularity. [Id. at 14-19]. Finally, Harvey contends that the good faith exception does not apply. [Doc. 57 at 3-9].

### a.   **Probable Cause**

As previously stated, in reviewing an issuing judge's determination that probable cause existed on the face of the affidavit, this Court's role is to "ensure that the [issuing judge] had a 'substantial basis for . . . conclud[ing]' that probable cause existed." Gates, 462 U.S. at 238 (second and third alterations in original) (citation omitted). Agent Meador's affidavit alleged sufficient facts to establish probable cause to believe that evidence of the alleged crimes would be found at Harvey's residence. Agent Meador relayed that text messages from November 17, 2014, revealed that after Henry purchased an AK-47 from a seller, Henry arranged for the

seller to mail the magazine for the AK-47 to Harvey's residence, [Doc. 56-1 at 12 ¶ 24], and that the seller did in fact mail the magazine via United States Mail with a tracking number, [id. at 12 ¶ 25]. Agent Meador detailed text messages between Harvey and Henry on November 19, 2014, in which Harvey confirmed the package arrived at his residence and Henry replied that he would pick it up, [id. at 13 ¶ 26], and on November 24, 2014, in which Harvey, after coordinating a place to meet at the airport with Henry, stated,"I forgot other package, from mail," [id.]. Based on his training and experience, Agent Meador averred as follows:

> I believe that in this exchange, Harvey and Henry are discussing the delivery of the magazine to [Harvey's residence]. Harvey then explains to Henry that he accidently left the magazine at [his residence] instead of including it in the bag of guns being smuggled through the airport. Henry then tells Harvey that he will just have [to] "deal without it." Accordingly, Henry and Harvey were using [Harvey's residence] in order to receive shipments of firearm paraphernalia in furtherance of their smuggling scheme, and accordingly, I believe that inside the [residence] exists books and records of shipments received by "Marcus Harvy"–the fake name used by Harvey and Henry to receive the firearm magazine discussed above. I further believe Henry provided Harvey a cash payment (as described by Harvey as "the surprise underneath") at the bottom of the bag with the weapons and that Henry agreed to pay Harvey even more money in the future. I am aware that criminals often keep ledgers, records, and other banking records to account for payments of schemes. Thus, I believe such evidence remains at [Harvey's residence].

[Id. at 14 ¶ 28 (all caps omitted)].

Harvey asserts that the "November 17, 2014 text does not establish use of []
[Harvey's residence] to receive shipments of firearm paraphernalia," but instead
indicates that on this one occasion Henry purchased something, and he asked
Harvey if he could mail the magazine to his address.  [Doc. 46 at 12].  However,
Harvey's argument in this respect overlooks the fact that the "Supreme Court has
warned lower courts of the error of not consider[ing an officer's] affidavit in its
entirety and judging bits and pieces of information in isolation."  United States v.
Lebowitz, 647 F. Supp. 2d 1336, 1345 (N.D. Ga. 2009) (alteration in original) (internal
marks omitted) (quoting Massachusetts v. Upton, 466 U.S. 727, 732 (1984) (per
curiam)).  Harvey fails to acknowledge other facts set forth in the affidavit that tied
the firearms smuggling scheme to his residence, including the detailed text messages
between Harvey and Henry on June 30, 2014, and July 20, 2014, where on both
occasions, they arranged for Henry to leave something in Harvey's vehicle at his
residence.  [Doc. 56-1 at 15 ¶¶ 30-31].  Based on these exchanges, Agent Meador
averred that "Harvey and Henry used the [residence] as the location where Harvey
and Henry would coordinate the transportation of the firearms," and more
specifically that "Harvey and Henry would exchange text messages wherein Henry
would advise Harvey of his upcoming flight schedule" and "[t]hey would then
coordinate Harvey receiving the bag of firearms to be smuggled through Hartsfield-

Jackson at the [residence]."  [Id. at 12-13 ¶ 29 (all caps omitted)].  Moreover, Agent Meador also explained that Harvey communicated with Henry about using an account to access the Outdoors Trader website where firearms could be acquired, but a review of the data on Harvey's cell phone that was seized at the time of his arrest revealed that he did not access the website from his cell phone, leading Agent Meador to aver that Harvey "likely created and accessed the gun-trading account with a computer located at [his residence]."  [Id. at 17 ¶ 36].  Thus, the affidavit supplied facts to support finding that Harvey's residence played an integral role in the firearms smuggling scheme sufficient to establish probable cause to search Harvey's residence.  See United States v. Acosta, 807 F. Supp. 2d 1154, 1226-27 (N.D. Ga. 2011) (citations omitted) (finding probable cause to search the defendant's residence where communications between co-conspirators demonstrated that the residence was used as a place to store drugs prior to distribution and affiant opined that "the items sought in the warrant would likely be kept at the residence").[27]

---

[27] Harvey argues that "there is no information to indicate that Harvey would keep ledgers, records, and other banking records to account for the payment of schemes."  [Doc. 46 at 12 (internal marks omitted)].  However, Harvey ignores the information provided by Agent Meador pertaining to Henry's payments to Harvey, see [Doc. 56-1 13 ¶ 26], and Agent Meador's opinion, based on his training, experience, and investigation of this case, that "criminals often keep ledgers, records, and other banking records to account for the payments of schemes," [id. at 14 ¶ 28].  And, "in cases determining whether there is probable cause for an arrest or to issue a search warrant, it is well established that courts may rely on the type of opinion evidence, based on a law enforcement officer's training and experience,"

Harvey contends that the "information [Agent Meador] provided to establish a link to Harvey's use of computers in the scheme, and therefore warrant the seizure of any and all information/data contained on computers, electronic media, cell phones, and the world-wide web, is astonishingly minuscule, tenuous, and irrelevant at best." [Doc. 46 at 12-13].[28]  Agent Meador detailed several electronic communications between Harvey and Henry in furtherance of their smuggling scheme, and he explained that Henry used the Outdoors Trader website under the user name "eliteteam6" to purchase some of the firearms he smuggled to New York, and that "a review of the text messages between [Harvey] and Henry on the Samsung Telephone shows that [Harvey] also held an account on the Outdoors Trader's website." [Doc. 56-1 at 16 ¶ 33].  On multiple occasions, Henry asked Harvey for his user name and password for the Outdoors Trader's website, [id. at 16 ¶ 34], and on November 14, 2014, Henry asked Harvey to create an account, and

---

as offered by Agent Meador in his affidavit.  Acosta, 807 F. Supp. 2d at 1201 n.39 (citations omitted).

[28]  Harvey also specifically complains that the affidavit "provided no information to lead the magistrate to believe that evidence of the alleged crime could be found on cell phones."  [Doc. 46 at 49].  This argument is without merit given Agent Meador's inclusion in his affidavit of the evidence of specific text messages between Harvey and Henry, and Harvey's admissions when interviewed that he used his cell phone to coordinate the bag hand-off with Henry and that "he and Henry communicated through both telephone calls and text messaging."  [Doc. 56-1 at 11 ¶ 20].

Harvey replied that he would get on the website and create an account when he had time, [id. at 17 ¶ 35].  Agent Meador averred that "[Harvey] and Henry were discussing an additional account–separate from 'eliteteam6'–to facilitate the acquisition of firearms from the Outdoors Trader website . . . . because the 'eliteteam6' account was already being utilized before, during, and after Henry's various requests for the account information from [Harvey]."  [Id. at 17 ¶ 36].  He further averred that Harvey "likely created and accessed the gun-trading account with a computer located at [his residence]" because a review of the data from the cell phone seized from Harvey at the time of his arrest showed that he did not access the website from his cell phone.  [Id.].

In addition, Agent Meador detailed text messages between Henry and Harvey, in which Henry asked Harvey to send him a picture of the package from the mail, averred by Agent Meador to be the AK-47 magazine.  [Id. at 18 ¶ 37].  He stated that because Harvey's cell phone did not contain such a photograph or the record of Harvey sending a photograph to Henry, he believed that Harvey and Henry were using another form of electronic communication to further their smuggling scheme.  [Id. at 19 ¶ 38].  The totality of the facts set forth in Agent Meador's affidavit sufficiently support a person of reasonable caution in believing that evidence of a crime would be found on computers, cell phones, and other

electronic storage devices at Harvey's residence, and that is all that is required for probable cause.  Florida v. Harris, 133 S. Ct. 1050, 1055 (2013) (citations omitted).  Thus, Harvey's argument that the affidavit in support of the search warrant for his residence did not establish probable cause is without merit.

Moreover, contrary to Harvey's contention, the information provided in Agent Meador's affidavit was not stale.  "For probable cause to exist . . ., the information supporting the government's application for a search warrant must be timely, for probable cause must exist when the magistrate judge issues the search warrant."  United States v. Harris, 20 F.3d 445, 450 (11th Cir. 1994) (citations omitted); United States v. Sanders, No. 1:12-cr-373-WSD-ECS, 2013 WL 3938518, at *2 (N.D. Ga. July 30, 2013) (citations omitted).  "There is no particular rule or time limit for when information becomes stale."  United States v. Bervaldi, 226 F.3d 1256, 1265 (11th Cir. 2000) (citations omitted); United States v. Bushay, 859 F. Supp. 2d 1335, 1378 (N.D. Ga. 2012), adopted at 1355 (citations omitted).  Instead, "[t]o evaluate staleness claims, [the Court] look[s] at the unique facts of each case and may consider the maturity of the information, the nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched."  United States v. Deering, 296 F. App'x 894, 898 (11th Cir. 2008) (per curiam) (unpublished) (last

alteration in original) (citation and internal marks omitted); <u>United States v. Rojas-Coyotl</u>, Criminal Action No. 1:13-cr-0128-AT-AJB, 2014 WL 1908674, at *5 (N.D. Ga. May 13, 2014), adopted at *1 (quoting <u>Harris</u>, 20 F.3d at 450). "[W]here an affidavit recites a mere isolated violation then it is not unreasonable to believe that probable cause quickly dwindles with the passage of time"; on the other hand, "if an affidavit recites activity indicating protracted or continuous conduct, time is of less significance." <u>Bemka Corp.</u>, 368 F. App'x at 943 (alteration in original) (citations and internal marks omitted).

In his affidavit, Agent Meador detailed five separate occasions over a period of almost one year, January 2014 to December 2014, in which Harvey and Henry allegedly smuggled firearms through airport security, [Doc. 56-1 at 9-10 ¶¶ 16, 18], which was not too attenuated from May 29, 2015, the date the warrant was signed, <u>see</u> <u>United States v. Miller</u>, Criminal Action No. 4:11–CR–0044–RLV–WEJ, 2012 WL 1606043, at *5 (N.D. Ga. Mar. 26, 2012), adopted by 2012 WL 1610129, at *1 (N.D. Ga. May 7, 2012) (rejecting defendant's argument that because the most recent event cited in agent's affidavit occurred five months prior to the date the warrant was issued, the affidavit contained stale information, given the ongoing nature of the crime). Moreover, the location to be searched was Harvey's residence, "which by

its nature indicates permanency in items kept and stored there." Acosta, 807 F. Supp. 2d at 1228 (citing Bervaldi, 226 F.3d at 1265).

The nature of the computer and digital evidence sought "also weighs against a finding staleness." United States v. Payne, 519 F. Supp. 2d 466, 477 (D.N.J. 2007), aff'd, 394 F. App'x 891 (3d Cir. 2010) (unpublished).  Agent Meador explained in his affidavit that, based on his knowledge, training, and experience, he knew that "computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet." [Doc. 56-1 at 20]. Indeed, "numerous courts have recognized that digital files remain on computers for extensive periods of time, even if they have been deleted." United States v. Coon, No. 10-CR-110A, 2011 WL 1871165, at *3 (W.D.N.Y. May 16, 2011).  "For this reason, many courts have suggested that the staleness issue in the context of digital evidence is somewhat unique, and the passage of time does not necessarily render the evidence stale." Id. (citations omitted).  The Court is persuaded that the multiple instances of alleged firearms trafficking activity over an approximately one year period, facilitated through electronic communications, together with the location and nature of the property being searched, "overcomes any alleged staleness in the information in the affidavit." Acosta, 807 F. Supp. 2d at 1228; Payne, 519 F. Supp. 2d at 477; see also Sanders, 2013 WL 3938518, at *8

(alterations in original) (citation omitted) ("'Although most of the information contained in the affidavit referred to events which took place over two years before [the federal agent] applied for the warrant, the affidavit nonetheless alleged a longstanding and protracted criminal conspiracy . . . . Because the affidavit alleged ongoing activity and a continuing relationship between the coconspirators, the information was not fatally stale.'").  Therefore, Harvey's staleness argument is without merit.

### b.    Particularity

As discussed earlier, the Fourth Amendment requires that warrants particularly describe the place to be searched and the persons or things to be seized. Bemka Corp., 368 F. App'x at 943 (citation omitted).  That is, the "description is considered 'sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized.'" Betancourt, 734 F.2d at 754-55 (quoting United States v. Cook, 657 F.2d 730, 733 (5th Cir. 1981)).

"It is universally recognized that the particularity requirement must be applied with a practical margin of flexibility, depending on the type of property to be seized[.]" Wuagneux, 683 F.2d at 1349 (citations omitted).  Indeed, "federal courts applying a reasonableness analysis on a case-by-case basis have rejected most particularity challenges to warrants authorizing the seizure and search of entire

personal or business computers." Brooks, 2014 WL 292194, at *11 (citation and internal marks omitted).  In this case, Attachment B described the property to be seized, computers and storage media, in as specific a manner as the circumstances permitted.  See Aguirre, 368 F. App'x 987-88 (citation omitted); Brooks, 2014 WL 292194, at *11-12.  Because it identified the property authorized to be seized as "computers or storage media used as a means to commit the violations described above" and limited the evidence seized from such property as follows: evidence of who used, owned, or controlled the computer; evidence of storage devices attached to the computer; evidence of the times the computer was used; passwords and encryption keys; records of information and Internet Protocol addresses used by the computer; records of or information about the computer's internet activity; and contextual information necessary to understand the evidence seized, the particularity requirement is satisfied here.  [Doc. 56-1 at 29-30 ¶ 1]; see also Conrad, 2013 WL 4028273, at *9 (citations omitted).

Harvey also complains that the warrant was overly broad in that it "authorized a search and seizure of every possible and conceivable piece of data on the computers and phones, and any files or data contained in any email accounts related to them or related to any application for third-party websites, such as email accounts and user-based web-sites."  [Doc. 46 at 18].  He then summarizes several

cases, none of which are from the Eleventh Circuit, in which courts imposed protocols for search warrants for electronic communication service providers or data stored on seized devices.  See [id. at 19-49].  These cases, of course, are not binding, and indeed run counter to circuit precedent because, as noted earlier, "[i]t is well-established in the Eleventh Circuit that warrants of this nature need not specify search protocols or methodologies in order to pass constitutional muster." Intakanok, 2014 WL 4825368, at *8 (citing Khanani, 502 F.3d at 1290 (rejecting defendants' argument that "the lack of a written 'search protocol' required the district court to suppress all evidence agents seized as a result of the search of the defendants' computers"); Bradley, 644 F.3d at 1258 (rejecting outright "claim that the searches were unconstitutional because the agents failed to obtain pre-approval from the district court of a search protocol before conducting the searches")).[29]

---

[29] Harvey also argues that there were no procedures in place for how the agents would search through all of the electronic data, [Doc. 46 at 14], and he points out that his child lived with him part-time, yet there is no procedure to ascertain the user of the property, [id. at 18].  However, as addressed previously, "the lack of a detailed computer search strategy does not render the warrant deficient as to the search and seizure of computers in this Circuit."  United States v. Lentz, No. CR406-309, 2007 WL 2177071, at *4 (S.D. Ga. July 25, 2007), adopted at *1 (citation and internal marks omitted).  Moreover, the description of the evidence to be seized specifically sought "evidence of who used, owned, or controlled the [computer] at the time the things described in this warrant were created, edited, or deleted[.]" [Doc. 56-1 at 29 ¶ 1].  Harvey also alleges that the warrant failed to provide a time limitation, but "the Court disagrees with [Harvey's] contention that the warrant is presumptively invalid for lack of a temporal restriction."  United States v. DSD Shipping, A.S., CRIMINAL NO. 15-00102-CG-B, 2015 WL 5164306, at *8-9 (S.D. Ala.

Accordingly, Harvey's reliance on these cases is misplaced, and his argument in this respect is rejected.

### c.  Good Faith Exception

Even if the search warrant for his residence suffered from one or more of the defects alleged by Harvey, the <u>Leon</u> good faith exception applies and the suppression of the evidence seized from his residence would not be warranted.  As already discussed, Agent Meador's affidavit provided ample facts for the issuing judge to conclude there was probable cause for the warrants, and therefore, it was objectively reasonable for Agent Meador to believe in good faith that probable cause existed for him to rely on and execute the warrant.  <u>Martin</u>, 297 F.3d at 1313.

For the same reasons already expressed, the Court rejects Harvey's contention that the warrant was so facially deficient that it failed to adequately particularize the items to be seized.  The May 29, 2015, search warrant was sufficiently particular to enable the executing officers to ascertain the items they were authorized to seize and to prevent them from engaging in a general exploratory search.  <u>See</u> <u>Lee</u>, 2015 WL

---

Sept. 2, 2015) (citation and emphasis omitted) (rejecting defendant's argument that the warrant failed to include temporal restrictions because "the affidavit specifically referenced . . . the period in which the alleged violations of federal law occurred" and Attachment B contained an additional temporal restriction as it listed the items to be searched as "[e]vidence of user attribution showing who used or owned the computer at the time the things described in his warrant were created, edited, or deleted").  Thus, Harvey's argument is without merit.

5667102, at *12 (ruling that even "if the warrants were unconstitutionally overbroad, the agents who executed the warrants reasonably relied on their validity, and therefore, evidence seized pursuant to the warrants is not subject to the exclusionary rule"); United States v. Tsarnaev, 53 F. Supp. 3d 450, 458 (D. Mass. 2014) (finding good faith doctrine would defeat defendant's argument of lack of adequate particularity); United States v. Lustyik, No. 2:12-CR-645-TC, 2014 WL 1494019, at *9-10 (D. Utah Apr. 16, 2014) (good faith doctrine applied where officers reasonably could have concluded that email warrants were not overly broad since the warrants limited subsequent seizure to information related to specific crimes). Thus, the Court finds that the good faith exception applies, and it is **RECOMMENDED** that Harvey's motion to suppress evidence arising from the search of his residence pursuant to the May 29, 2015, warrant, [Doc. 46 at 3-8, 11-50], be **DENIED**.

### 2. *June 4, 2015, Search Warrant*

Harvey alleges that the affidavit in support of the warrant obtained on June 4, 2015, was not supported by probable cause because "there was no information to support the idea that firearm paraphernalia or firearms related to crimes already allegedly occurring would be found in [Harvey's] residence." [Doc. 46 at 50-51]. However, Harvey's motion to suppress the box of ammunition recovered from the shed is moot because the government does not intend to offer it as evidence at trial.

59

See [Doc. 56 at 7-8].  Harvey also asserts that the search of the shed exceeded the scope of both the May 29, 2015, and June 4, 2015, warrants because neither "authorize[d] a search of the curtilage area and outbuildings of the residence." [Doc. 46 at 51].  While "[t]he warrant does not expressly mention the shed, and it defines the 'premises to be searched' as only the house itself . . . . '[e]very published opinion addressing the issue has concluded that a warrant authorizing the search of a residence automatically authorizes a search of the residence's curtilage.'" United States v. Kellogg, Criminal Action No. 1:12-CR-383-1-CAP, 2013 WL 3991956, at *17 (N.D. Ga. Aug. 1, 2013), adopted at *1 (citations omitted).  Harvey does not argue, nor does he allege any facts to suggest, that the shed was not within the curtilage of the residence.  See generally [Doc. 46].  In fact, Agent Meador stated that the "detached storage shed [was] located in the backyard of the residence, [Doc. 56-1 at 37], and absent any contrary evidence, there is no basis for finding that the shed was located outside of the residence's curtilage and thus was not within the scope of the search warrants, see United States v. Montieth, 662 F.3d 660, 670 n.2 (4th Cir. 2011) (citations omitted) (rejecting defendant's argument that evidence found in the shed in the backyard should be suppressed because the shed was in the backyard and within the curtilage of the home).  Moreover, to the extent Harvey contends that the search of the shed affects the admissibility of the other evidence found at his

residence, he is mistaken because "[a]bsent a flagrant disregard of the terms of the warrant, the seizure of items outside the scope of a warrant will not affect the admissibility of items properly seized." Khanani, 502 F.3d at 1289 (citation and internal marks omitted). Therefore, even if this Court accepted Harvey's argument that the shed was outside of the scope of the warrants, it would not affect the items properly seized from Harvey's residence pursuant to the warrants.[30]

## III.  CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Harvey's pending motions to suppress, [Docs. 29 & 46], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

---

[30] Harvey makes a couple of other arguments concerning the June 4, 2015, warrant, which the Court will briefly address. Harvey first argues that the June 4, 2015, warrant "was based on the illegally obtained prior warrants in this case." [Doc. 46 at 50]. As discussed *supra*, the Court finds that the warrants for Harvey's cell phone and the May 29, 2015, search warrant for his residence were supported by probable cause and described the items to be seized with sufficient particularity. Thus, Harvey's argument is without merit. Harvey also argues that the affidavit included stale information, but he fails to specify which facts he contends were too stale to support probable cause. [Id. at 51]. Moreover, Agent Meador's affidavit supplied information learned during the execution of the May 29, 2015, search warrant on June 4, 2015, which certainly was current and not stale.

**IT IS SO ORDERED** and **RECOMMENDED**, this 30th day of November, 2015.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE